## A. M. ARMSWORTHY V. THE STATE.

### No. 3037. Decided June 21, 1905.

**1.—Murder in Second Degree—Statutes Construed—Destruction of Life.**

Where in a prosecution for murder the testimony showed that deceased died within a few days of six months after the wounds were inflicted by defendant, not necessarily fatal without certain complications which did not arise, the court, under the law of reasonable doubt, and articles 651 and 652, Penal Code, should have charged that if the wounds inflicted by defendant upon deceased did not cause his death, and defendant was not the guilty agent that brought about the complete destruction of his life, then he was not guilty of murder, and this although the health of deceased gradually failed under the wounds thus inflicted.

**2.—Same—Self-Defense—Charge of the Court.**

Where in a prosecution for murder the testimony of the defendant tended to show self-defense, it was error not to charge on that issue.

**3.—Same—Manslaughter—Aggravated Assault—Charge of the Court.**

Where in a prosecution for murder the State's testimony showed that the defendant and deceased met in the public road, deceased being in a wagon and defendant walking, and that words ensued between them and defendant attempted to shoot deceased with a pistol which snapped and the defendant left, but in a few minutes returned with a gun and shot deceased in the face, putting out his eyes and slightly wounding him in other portions of his head and face, the deceased dying within a few days of six months after such wounds were inflicted, and the defendant's testimony raised the issues of manslaughter and aggravated assault, it was error not to charge on these issues.

**4.—Same—Self-Defense—Previous Threats.**

Where in a prosecution for murder the evidence raised the issue of previous threats on part of deceased to injure defendant, the court, in presenting the law of self-defense, should have charged on the question of previous threats.

Appeal from the District Court of Bowie. Tried below before Hon. P. A. Turner.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Mahoffey & Thomas* and *J. B. Manning,* for appellant.—To sustain a conviction of murder, the evidence must show beyond a reasonable doubt that the deceased was killed by the act, agency, procurement or culpable omission of the defendant and such killing must be complete by the act, agency, procurement or omission of the defendant, and in case of a reasonable doubt as to whether the destruction of life was caused by the act, agency, procurement or omission of the defendant he is entitled to an acquittal; and where this issue is suggested by the testimony it is the imperative duty of the court to so instruct the jury. White's Penal Code, arts. 651 & 652; Morgan v. State, 16 Texas Crim. App., 593.

The court erred to the great prejudice of the defendant in giving in charge to the jury the following instructions to wit:

"If the evidence in this cause fails to establish to your satisfaction, beyond a reasonable doubt, that the wounds inflicted by the defendant, if any, on the deceased, E. G. James, caused his death, then you will consider whether the defendant is guilty of an assault with intent to murder."

In so charging the jury, the court committed, among other errors, the following:

1st. A vital issue made by the testimony in the case is presented in a negative manner and without informing the jury that upon this issue the burden of proof rested upon the State and not upon the defendant.

2nd. As framed, such charge was calculated to impress the jury with the belief that it devolved upon the defendant to establish that the death of E. G. James was not caused by wounds inflicted by him.

3rd. Such instructions are erroneous, because the court failed therein or in connection therewith to tell the jury that if the death of E. G. James was not shown by the evidence, beyond a reasonable doubt, to have been caused by the wounds inflicted upon him by defendant, then it was their duty to acquit the defendant of any degree of homicide. Reynolds v. State, 8 Texas Crim. App., 412; Greta v. State, 9 Texas Crim. App., 429; Irvine v. State, 20 Texas Crim. App., 12.

In determining whether or not the court should submit to the jury the law of manslaughter, the controlling question is whether the homicide was the result of passion arising from adequate cause or was done deliberately and with premeditated design; and this is always a question of fact to be determined not by the court, but by the jury, and where there is evidence in a case of conduct on the part of the deceased at the time of the killing, which, coupled with his previous acts, conduct and threats toward the defendant, was calculated to arouse such a degree of anger, rage, resentment or terror in a person of ordinary temper as would render the mind incapable of cool reflection the court should charge on manslaughter. Swain v. State, 12 Texas Ct. Rep., 812; Baltrip v. State, 30 Texas Crim. App., 545; Beaty v. State, 30 Texas Crim. App., 677; Neylands v. State, 13 Texas Crim. App., 536; Miles v. State, 18 Texas Cim. App., 156; Halliburton v. State, 32 Texas Crim. Rep., 51.

The court erred to the great prejudice of the defendant upon the trial of this cause in failing and refusing to charge the jury upon the law or any phase relating to the offense of aggravated assault and battery, and specially in failing and refusing to charge the jury to the effect that if they found that defendant shot and wounded E. G. James, the deceased, but further found that E. G. James did not die as a result of the wounds inflicted upon him by the defendant, or if they had a reasonable doubt thereabout, and further found that the defendant in inflicting the wounds upon deceased was not justified under any phase of the law of self-defense as applied to the evidence, and further found that the shooting of the deceased by the defendant was

not upon either express or implied malice, or if they entertained a reasonable doubt thereabout, then in that event, if they found the defendant guilty, they would find him guilty of no higher grade of offense than aggravated assault and battery.

Where there is evidence in the case of threats by the deceased against the defendant, which threats are brought to the knowledge of the defendant or are made in his presence and hearing, and at the time of the homicide the person killed, by some act then done, manifests an intention to execute the threats so made the court should submit the law of threats to the jury in its charge. And it is immaterial how long before the homicide said threats are made. It is sufficient if it appears they were made prior to the homicide. Swain v. State, 12 Texas Ct. Rep., 812; art. 713, Penal Code.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment fixed at confinement in the penitentiary for a term of five years.

The evidence shows in substance that appellant and deceased met in the public road, deceased being in a wagon, and appellant walking. Words ensued between them and appellant attempted to shoot deceased with a pistol. The pistol snapped and appellant left, and in a few minutes returned with a gun and shot deceased in the face, putting out his eyes, and slightly wounding him in other portions of the head and face. Dr. Talbot testified that he was a physician; could not tell how many shot hit deceased; could not count them; he was shot all over the face. His eyes were shot out, and he was shot in the mouth. He was shot in the hair, neck, throat, and chest, and perhaps one or two of his teeth were shot out. "I extracted some of the shot. Waited on deceased eight or ten days. In my opinion this was a very serious wound, but I did not consider it fatal unless complications arose. I ceased attending him because I did not think my services were needed any longer and thought his condition very good. I did not consider the wounds dangerous. It was a serious wound but not necessarily dangerous. By complications I mean erysipelas, blood poisoning or pneumonia. I consider it, as far as the wound went, unless these complications set up, he was out of danger when I quit." The testimony does not show that any complications such as the physician testified about ensued. Within two months after deceased was shot he was up and able to visit his neighbors. It was within a few days of six months after the wounds were inflicted by appellant, before deceased died. Appellant insists that the court should have charged article 651 and 652, Penal Code. The charge of the court in reference to the matter thus suggested is, as follows: "I further charge you, upon an indictment for murder defendant may be convicted of assault with intent to murder. If the evidence in this

case fails to establish to your satisfaction, beyond a reasonable doubt, that the wounds inflicted by the defendant, if any, on the deceased, E. G. James, caused his death, then you will consider whether the defendant is guilty of an assault with intent to murder." The articles cited above are more specific, as insisted by appellant, than the common law, and state not only that the destruction of life must be brought about by the act, agency, procurement or omission of another, but that the destruction of life must be complete by such act or agency. In other words, if the wounds inflicted by appellant upon deceased did not cause his death, and appellant was not the guilty agent that brought about the complete destruction of his life, then he is not guilty of murder. It is true that the witnesses testified deceased did not recover, that his health gradually failed under the wounds inflicted by appellant. We take it, that appellant being entitled to the reasonable doubt in the matter, should have had a charge presenting the question more accurately.

Appellant insists that the court should have charged on self-defense. Appellant testified in his own behalf substantially as follows: "That the difficulty between himself and deceased occurred on June 28, about 5 o'clock; that he had been to Texarkana with his father and came back with him; that he (defendant) in company with Gardner, left Dr. Bentley's home and started to his (defendant's) home. Deceased lived about three hundred yards south of Bentley's house, on the west side of the road, opposite Gardner's. When defendant and Gardner were about half way between Bentley's place and Gardner's, defendant heard a wagon coming behind him and glancing back saw it was deceased in company with Walraven and Hickson. When defendant saw the wagon he said to Gardner that he wanted to speak to James (deceased). Defendant accosted James, as follows: 'I said hold on a minute, Mr. James.' He pulled up the lines and said, 'Well.' I said, 'Mr. James, what is the matter? What have we done to you as a neighbor to cause you to take such a stand as you have?' He said, 'I have done nothing, except what the law requires me,' or words to that effect. I said, 'I care nothing for that, but you made a remark this afternoon, and I want to know whether it was with reference to my sister or not.' He said, 'You God damn little son of a bitch, do you presume to ask me what I say or do,' or words to that effect; and he said, 'I will wear you out.' He had a whip in his hand, or reached for one—he had it anyway when I looked up, and he was threshing at my face and eyes from a standing position in the wagon. He was sitting down when I spoke to him, and after I spoke he rose and commenced threshing at me when I asked those questions. When he threatened to whip me he reached out that way for me, and I drew a revolver. I said to him, 'It is enough to scandalize my people, let alone horse-whipping me, and I will not stand for it. I will certainly hurt you if you hit me in the face with that whip.' Hickson said to me, 'Don't shoot, Arthur.' I said. 'I am not going to shoot, and I

am not going to be horse-whipped either.' Walraven and Hickson were trying to get hold of James to hold him back in the seat, and the mules either started up or somebody started them, and they went a few paces, three or four, south, and Mr. James jumped out of the wagon and said, 'I will wear the road out with that little son of a bitch if I can get hold of him,' and I looked back and he was coming on me, and I drew the revolver again. He threw the whip at me and I picked it up and threw it back in the wagon, and said, 'I will have no more to do with you. You have got no sense. I see that.' I went away from there then, went north. I did not snap my gun at him. I went in the direction of Dr. Bentley's. After I had turned the corner of the lane going east, I heard James say, 'Oh Charles, bring me that; bring me that. I will kill the damned son of a bitch, if he is the last man I ever see.' I heard James say that. I was then on my road home. *  *  * Some one halloaed in the house, 'Come in, Arthur, they are going to intercept you across the field.' I said, 'I guess not,' and my aunt or somebody in the rear of the house came to the side gate in the south yard fence, and got hold of me, and said, 'Come in, Arthur, and eat supper, and then go home,' and I could not well get away. She was kind of excited, and had hold of me, and I advanced into the gate, through the wood-house, then through the dining room into the middle room. I remained in the house a very short time. I just stepped into the middle room and there was a south window. I expected somebody in that middle room. My aunt left me there in the dining room, or went around to the rear. *  *  * I heard exceedingly loud talking, looked out the window, and saw two or more persons coming in a northerly direction. I saw one of them was Mr. James. They were probably ten or twelve paces apart. I heard some loud cursing, but could not distinguish the words. I was inside the house, and could hear one oath after another, a regular torrent of oaths. I thought they were undoubtedly coming after me, and to do me some harm. There was a double-barrel shotgun sitting in the closet just to my right, and I picked it up by the barrel. *  *  * and went out of the house, but did not see any one, but could hear somebody. *  *  * I stood there half a minute possibly before I saw any one. I then saw Charley James and saw his father afterwards. I could not say positively how close Charley was to his father, but the best I can remember would be, about half the distance between his father and myself. When I saw him he was possibly fifteen steps from me, and I says, 'Hold on, Charley,' and he stopped, and almost simultaneously or immediately afterwards his father halloaed and said, 'Stand aside, Charles, I will fix the son of a bitch,' and then I looked beyond him. He stepped out of the way a couple of paces or more, and I saw his father coming on me with his hand back here, and the shot was fired. He was coming on me with his hand behind him. I could not see what he had in his hand. *  *  * At the time I saw James and heard him tell his son to stand aside, I thought he was going to shoot

me. From the attitude he was in, the position he was in, it left no room for doubt at all." This evidence as we understand it, raises the issue of self-defense, and the court should have charged on it.

We think the court erred in failing to charge the jury upon the issues of manslaughter and aggravated assault.

In presenting the law of self-defense on another trial we suggest that the court charge on previous threats made by deceased to injure appellant. Swain v. State, 12 Texas Ct. Rep., 512; art. 713, Penal Code.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*