## Mark Rice v. The State.

### No. 3815. Decided February 27, 1907.

**1.—Murder in First Degree—Hearsay Evidence—Withdrawal of Testimony.**

Where upon trial for murder, the court admitted hearsay testimony without objection of defendant, and thereafter the court on motion of defendant withdrew said testimony, including all questions to and answers of the witness, in his charge to the jury, there was no legal basis for complaint.

**2.—Same—Harmless Error—Impeaching Witness—Remarks of Court.**

Where upon trial for murder, a witness for the defendant on cross-examination by the State denied that he had ever received money from another to get up evidence, etc., whereupon a colloquy ensued between the court and the counsel for the defense, and the court finally instructed the jury in his charge to disregard all questions to and answers of said witness, and also to disregard said colloquy between the court and counsel, there was no harmful error.

**3.—Same—Bill of Exceptions—Practice on Appeal.**

Where upon trial for murder, defendant's bill of exceptions was totally defective in not stating any ground of objection, the same could not be considered on appeal.

**4.—Same—Lack of Verity of Witness—Cross-Examination.**

Where upon trial for murder, the State upon cross-examination of defendant's witness attempted to show that his testimony had been concealed, as a circumstance to show its lack of verity, there was no error.

**5.—Same—Evidence—Defendant as a Witness—Cross-Examination.**

Where upon trial for murder, the principal State's witness, who was a clerk of deceased at the time of the homicide, had testified that the deceased was unarmed when killed, and afterwards when defendant took the stand as a witness and stated among other things that it looked to him like a framed-up-thing for deceased to murder him, there was no error to permit the State on cross-examination to ask the defendant whether he believed said State's witness was in the plot to kill him.

**6.—Same—Implied Malice—Charge of Court.**

See opinion for charge of court on implied malice held to be correct, except as to force used in self-defence.

**7.—Same—Self-Defense—Threats.**

Where upon trial for murder the evidence did not raise the issue of threats as defined in article 713, Penal Code, no charge on that phase of the case was necessary.

**8.—Same—Impression of Witness—Appearance of Deceased—Weapon.**

Upon trial for murder, it was error to admit the testimony of a State's witness as to the impressions of witness made by the appearance of the deceased, whom the witness described as being very bloody and having a death-like expression when he arrived at witness' house coming from the scene of the shooting, about five blocks away; and which testimony the trial court admitted as a circumstance to show whether or not the deceased was in such mental condition that he would think to dispossess himself of a pistol before reaching said witness, and to show whether he was armed at the time he was shot as contended by the defendant; there being no question as to the fatality of the wound received by deceased.

**9.—Same—Remarks of the Court—Colloquy With Counsel.**

Where upon trial for murder, the court, in admitting testimony as to the appearance of deceased, animadverted thereon that it was a circumstance that might have some bearing as to whether the deceased in that condition would have dispossessed himself of the pistol that he was supposed to have had when he was shot, etc., a direction by the court to the jury to disregard the same may not have been sufficient to have counteracted the impression on the jury of such remark by the court.

**10.—Same—Evidence—Immaterial Testimony.**

Upon a trial for murder, it was immaterial as to how long deceased had been married, and such testimony was inadmissible although it may not have been reversible error.

**11.—Same—Dying Declarations—Predicate—Question and Answer.**

Where upon trial for murder, the evidence showed that deceased died on Thursday evening after the shooting on Saturday night, and was hopeful until about ten or fifteen minutes before he died when he said he was going to die and asked the witness to send for his family, a sufficient predicate of his dying declaration was laid; and the question put to him as to whether he was armed when he was shot and the answer thereto that he was not, were not objectionable.

**12.—Same—Declaration of Deceased Not Essential.**

Upon trial for murder, where the predicate for the dying declarations of the deceased had been properly laid, it was improper to admit (besides the declarations of the deceased that he was going to die and that he was unarmed at the time he was shot) the further declaration that he told his wife and relatives good-bye and his brothers to be good men, to meet him in Heaven and not to hurt any body, and that he forgave the man who shot him.

**13.—Cross-Examination of Defendant—Declaration of Third Party.**

Upon trial for murder, it was inadmissible to prove by defendant on his cross-examination that a certain person came to see defendant while in jail, and said that he was sorry that defendant was in trouble, that defendant should say nothing except to his attorneys, and keep his mouth closed.

**14.—Same—Evidence—Collateral Attack—Impeachment.**

Upon trial for murder, it was error to permit the State to introduce impeaching testimony upon a collateral issue to affect the credibility of one of defendant's witnesses; and where the same is of an injurious character to the rights of the defendant, it constitutes reversible error.

**15.—Same—Case Stated—Collateral Attack—Fabrication—Limiting Testimony.**

Upon trial for murder, where a witness testified in behalf of defendant that he was present at the homicide, etc., and afterwards was introduced by the State and then stated that his former testimony was a fabrication, and that he had been bribed by his brother to testify for the defendant as he did in the first instance; and thereupon the State introduced said brother of the

witness who denied that he had bribed the witness, it was error to permit the State to recall the first witness to contradict the second witness with reference to such bribery; defendant not being connected with such transaction, which took place long after the homicide; neither did it constitute original testimony of fabrication against the defendant, but was offered by the State to affect the credibility of the second witness who was also defendant's witness. Such testimony could not be limited by the court so as not to prove injurious to defendant.

**16.—Same—Cooling-Time—Degrees of Murder.**

Cooling-time is applicable between murder in the first degree and second degree, and is as much involved between the degrees of murder as it is between murder and manslaughter.

**17.—Same—Charge of Court—Previous Altercation—Explanation.**

Where upon trial for murder, the evidence showed a previous altercation about fifteen minutes prior to the one which resulted in the homicide, and the State used this first altercation as furnishing the motive for the homicide and the animus on the part of the defendant for committing it, the court erred in failing to instruct the jury with reference to murder in the first degree based on said first altercation between defendant and deceased and cooling time in connection therewith; and this although the court submitted a charge on defendant's right to ask for an explanation of the conduct of deceased arising during the said first altercation. Brooks, Judge, dissents.

**18.—Same—Charge of Court—Manslaughter—Self-Defense—Adequate Cause.**

Where upon trial for murder, the evidence showed not merely antecedent insulting language but a demonstration on the part of the deceased, the court should have instructed on the theory of manslaughter as well as self-defense, in as much as defendant may not have been justified under the facts to slay deceased in self-defense, and that the evidence showed adequate cause. Brooks, Judge, dissents.

**19.—Same—Self-Defense—Force Used.**

On a trial for murder, where the evidence raised the issue of self-defense, the question of the use of more force than was necessary on the part of the defendant was not involved.

**20.—Same—Charge of Court—Self-Defense—Reasonable Doubt.**

Upon trial for murder, where the jury were instructed that unless they believed under the evidence beyond a reasonable doubt that the defendant did not act in his own self-defense then to give him the benefit of the doubt and acquit him, the charge shifted the reasonable doubt against the defendant.

Appeal from the District Court of McLennan County. Tried below before the Hon. Marshall Surratt.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*Taylor & Gallaher,* and *Kearby, Presler & Kearby,* for appelalnt.—On question of charge on manslaughter: Keith v. State, 94 S. W. Rep., 1044; Harris v. State, 89 S. W. Rep., 1064; Lunday v. State, 83 S. W. Rep., 352; Gray v. State, 83 S. W. Rep., 705; Armsworthy v. State, 88 S. W. Rep., 215; Lewis v. State, 89 S. W. Rep., 1073; Gilcrease v. State, 33 Texas Crim. Rep., 619; Neyland v. State, 13 Texas Crim. App., 549; Miles v. State, 18 Texas Crim. App., 170; Hawthorne v. State, 28 Texas Crim. App., 215. On the question of cooling-time: Puryear v. State, 17 Texas Ct. Rep., 727; Manning v. State, 85 S. W. Rep., 1149; Sowell v. State, 32 Texas Crim. Rep., 498; Keith v. State, 94 S. W.

Rep., 1046. On question of using more force than was necessary in self-defense: Scott v. State, 81 S. W. Rep., 951; Crenshaw v. State, 85 S. W. Rep., 1148; Kelly v. State, 62 S. W. Rep., 917. On charge on self-defense: Harris v. State, 89 S. W. Rep., 1065. On question of collateral attack and impeachment of witness: Luttrell v. State, 40 Texas Crim. Rep., 658; Newton v. State, 56 S. W. Rep., 64; Gann v. State, 57 S. W. Rep., 669; McDaniel v. State, 90 S. W. Rep., 504; Lounder v. State, 79 S. W. Rep., 552; Barbee v. State, 97 S. W. Rep., 1058; Kirk v. State, 89 S. W. Rep., 1067; Scott v. State, 93 S. W. Rep., 112; Drake v. State, 29 Texas Crim App., 265; Jones v. State, 38 Texas Crim. Rep., 87.

*F. J. McCord,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The testimony in this case for the State and defense is, in substance, as follows:

"Louey Thompson, witness for the State, testified as follows: I am a saloon man; remember the killing, was working for Mr. Luther Phelan at the time he was killed. I saw Mark Rice in the saloon that night, the first time, about 10 o'clock. He came with three gentlemen, one named Dunn, and the other named Clarke, and I believe the other was a carpenter. I forget his name. He remained about ten minutes. They were all taking refreshments. Defendant didn't say anything the first time he came. He came back after that by himself. The first time he came, I heard nothing said between him and Luther Phelan. Nothing was said about shaking dice. I was on duty that evening at the saloon. The first time he came, there must have been ten or twelve people in the saloon. He left the saloon after the first visit about half past ten. The first time they were in there, they had a conversation, but I don't know what it was about. I was waiting on customers. When Mark came in the first time, Luther was in front of the bar, and not behind it. I was behind the bar, and Rice was in front of the bar. It might have been a quarter of an hour from the time Rice left the saloon the first time until he came back the second time. When he came in the second time, I was behind the counter, Luther Phelan was in front of the counter. Moore and Mr. Luther were in conversation. Both of them stood in front of the counter. Mr. Moore was standing right close to the partition in the corner of the bar and the partition. Luther Phelan was standing right close to him. Rice came in the front door this time. He stepped up to the counter, and put two quarters down, and asked Phelan to join him and have something, and Phelan refused him, and said he didn't feel like it at the present time to join him, and Rice says 'Well, is there nobody else going to have something with me.' Mr. Moore was standing right close to him, and Mr. Moore says 'Well, I go you,' and Rice says, 'Well, I have finally got somebody

that is going to take a drink with me,' and at the same time, Luther Phelan looked at the clock and says, 'It's about time for me to go to the barber shop. It's about a quarter to 11,' and at that time, he kind of made a step towards the door, and Mr. Rice took about two or three steps backward, and got out his gun and shot him.

"Q. Do you remember hearing Rice say to Phelan he had mistreated him? A. He said something in that regards, not for an insultation, or something of that kind. He made a remark of some kind. Q. Do you remember what Phelan said in reply, whether he said anything? A. He said he thought he had not done anything wrong to him, and he intended to go to the barber shop, and intended to go home.

"Luther Phelan had nothing in his hands at the time he was shot. He did not put his hand about his pockets or anywhere. He did not curse Mark Rice. He did not talk or look like he was mad, because he was in the best humor. When Mark Rice shot him, Phelan got up to go to the door. He was right close. There is a kind of double door on hinges, and Phelan swung the door, and went out of it. It was done that quick, and I did not see him any more after that. Rice stood there for a while, and went up to the swinging doors and opened one of the doors, and looked around to see if he could see anybody, but there was nobody in the front. All were gone out, and he came back to the counter, and asked me he believed those two quarters were his money, and I said, 'Yes, sir; that is your money,' and he picked the two quarters up, and put them in his pocket, and went out the back door."

The testimony of the defendant, in his own behalf, is as follows:

"I was acquainted with Luther Phelan. Had known him some three years. I never had any difficulty with him previous to this trouble. I was up in my room at the McLelland Hotel, took a bath and came down about 8 o'clock and walked over to Charlie Morrison's. Bud Dunn and two or three others were standing there, talking and drinking. I stood and talked a little while with Dunn, and then I left him and went to the barber shop and got a shave. As there was a crowd there I was some little time getting a shave. I suppose about half past eight. I then walked back to the Mirror saloon and Bud Dunn was standing right in the front door. The Mirror is Charlie Morrison's place, corner of Fourth and Austin Street. Bud and I stood there and chatted some little time, and I said, 'Bud, let's go over to the Turf and get something to eat.' He said, 'No, I thank you, I do not feel like eating, but will walk up there with you.' We started over to the Turf and stopped in front of Matthews Brothers and looked in the show window. We stood there about five or ten minutes. Then we started on to the Turf, and Bud met some of his friends right in front of the Curry Liquor Company, right next door to the Turf. Bud then said to me, 'You go and get something to eat and we will wait for you here, and then go up and see old George,' meaning George Cook at the St. Charles. I walked into the Turf, and there was nobody but the negro porter behind the bar. Not a soul in the house, up in the front part, so I

said to the porter, 'Well, Henry, business seems to be rushing with you. Have they worked the bartenders down?' He said, 'No, sir; Mr. Fuller is back eating his lunch.' I walked back in the dining room and Ed Fuller and John Ashenhurst and, I think, Ben Riddle were sitting at the table eating. I looked on the lunch counter and did not see anything that appealed to my appetite. They asked me to come and eat with them. I thanked them and told them no, I didn't want anything to eat, that I didn't see. anything there, and I thought I would wait until I got a little hungry. Fuller commenced talking to me, and I commenced talking with him. He asked me to eat with him, and I told him that I saw nothing that appealed to my appetite, but if he had a gun I would borrow it until to-morrow morning. He said, 'I am sorry, old man, but there isn't a gun in the house,' I said, 'Why, don't tell me there isn't a gun in the house. I have worked here for two ,years and a half, behind this bar, and there never was a time there was not from one to six guns in the house.' He said, 'Well, this is a time there isn't one in the house,' I said, 'All, right, pal,' and I turned around and walked back up to the bar, and walked up to the negro porter, and said to him, 'Mr. Fuller said to give me one of those guns in the drawer,' I just did it as a joke to see if there was a gun there. The negro opened the drawer and said, 'Which one is yours, Mr. Mark?' and handed up two. I said, 'That is it.' I just got it as a joke. Fuller hollered at me in the meantime, 'Don't take that gun, it will cost you a drink.' I went out, and Bud Dunn was standing out in front waiting for me, and we walked up to the St. Charles. I had not seen Luther Phelan that night up to this time. I had had no altercation with him. I just took the pistol as a joke on Ed Fuller, because he told me there was no pistol there. Bud Dunn went with me to the St. Charles. He said, 'Let's go over to my old place and get a drink.' His old place that he referred to .was the Royal bar. He had been working there, so I says, 'All right,' and we went out the back way to the Royal bar. When we got there Louey Thompson was behind the bar, and Luther Phelan and some man, this man Moore, were playing the slot machine. Bud Dunn says, 'Let's all shake dice for the drinks.' So Louey Thompson grabs the dice box and sets it up on the counter, and I says, 'Come on, Luther, and shake dice with me. We are all going to shake dice for the drinks.' Luther says, 'No, I don't want to shake dice. I have got money to pay for my drinks when I want one.' I said, 'Come on, pal, and shake with us.' He says, 'I know when I want to drink and who to drink with, and I know when I want to shake dice, and when I want a drink I will buy it.' I says, 'All right, I didn't mean any offense at all.' So Louey Thompson says, 'Come on, I'll shake with you.' So we shook dice. First dash, low man buy the drinks. I got stuck. I laid a dollar on the bar and turned around to Luther, and said, 'Luther, come up and bring your friend and take a drink with me.' He says, 'I am a little bit particular as to who I drink with. I told you I didn't want anything to drink and whenever

I want anything to drink I will buy it myself.' I knew Bud Dunn had been working around there for Luther, and I thought probably they had had some difficulty or some difference or something and I came in there with him, and I thought I would take him out as quickly as possible, and turned around and said to Bud Dunn, 'Come on, let's go.' And after Budd Dunn, Louey Thompson and I had had our drink we went out. After we got out on the street starting back around to the St. Charles hotel, I asked Bud, 'What's the matter? What is the trouble with you and Luther?' He says, 'Nothing.' I says, 'O, don't tell me nothing.' I said, 'Don't you see how he was balling you.' He says, 'He was not balling me, he was balling you.' I says, 'Yes, he was balling me, but he was talking to me, and he was balling you through me.' He said, 'O, no, you can't hand old Bud that.' I said, 'That could not be possible, as we have always been the best of friends. There isn't a day that I don't go in his place and spend from 25 cents to a dollar every day since he has been around there. I used to go around to see him when he worked for his brother at the Oak Hall on the square, and I never went in there but what I spent something and I never took a drink but what I asked him to drink with me.' I says, 'We are the best of friends, and besides we are brother Eagles, and belong to the same lodge.' He says, 'Brother Eagles, hell. He is a hell of an Eagle.' He said, 'I wouldn't want a stiff's friendship like that, much less calling him brother.'

"In the meantime, we were walking on all the time to the St. Charles, we got back to the St. Charles, walked up to the bar, and I bought a drink around at the St. Charles. After we took a drink I asked the bartender if he had any white cigarette papers. He said no, they didn't have them, but they had them up in front. After Bud and I had a conversation there at the St. Charles, after we returned from our first visit to the Royal bar, I did not go out of the building. I did go out of the saloon part of the building. I went up in front, in the hotel part. I was only there about three or four minutes. The office of the hotel is in front. There is a cigar stand in front, on the right as you walk in. On the left is the office, and in the rear, where the saloon is, there is a screen door across the saloon part of it that screens it off from the rear with a couple of double doors, that you go in at to go back in the barroom. There was no cigarettes or tobacco in the saloon to sell. I did not go anywhere from the time Bud Dunn and I came back to the St. Charles until we returned to the Royal bar the last time, when the shooting occurred. I went in the hotel office to buy the cigarette papers, and I got a book of cigarette papers there and came right back into the saloon. After I came back I walked up to the bar and laid a dollar down on the bar and asked Bud Dunn and George Cook, the bartender, to have a drink with me, and they both refused. They said they had drunk enough, and didn't want any more. Then I says to Dunn, 'Let's go back over to the Luther's and get a drink.' He says, 'To hell with Luther. I wouldn't drink in a damn joint like that,' and

he says, 'I'm going home. Old Bud has had enough for to-night.' I says, 'All right. I am going back over there.' So I went out of the back way and went back over there. When I got there Luther Phelan was just closing his register, he had had his register open counting his money or something. He just closed the register and pulled a drawer open to the left of the register, as the register faces you, and he took a pistol out of the drawer and stuck it in his right hip pocket and walked around the end of the bar. I said, 'Come on, Luther, and let's take a drink,' He says, 'God d— you, I don't want anything to drink, and I am particular who I drink with,' and walked on as though he was going out, and got about even with me. I says, 'Come on, we are both brother Eagles. We are both Eagles, let's drink and be sociable.' He says, 'G— d— you and the Eagles, too. I know when I want a drink and who to drink with.' I says, 'What's the matter, are you drunk or crazy?' He says, 'No, I am not drunk, and you G— d— one-eyed s— of a b—, if you say or even think that I am crazy I will kill you like a damn dog.' Then he walks on like he was going out. Just as he gets to the screen door, right in the screen door, he turned around and says, 'If you even think I am drunk or crazy, you G— d— s— of a b—, I will kill you.' And then I shot. He throwed his hand back and started to draw something, and he had it part of the way out. It was a pistol. I saw it. That is when I shot. I was standing about middle way of the bar, about opposite the cash register. The screen doors where he was standing opened both ways. That is the screen doors next to Fifth Street. After I shot he went out the front way and went up Franklin Street. Moore and two or three others were in the saloon when I went there. This man Prather and Conant were there, and that fellow Moore. When this trouble first started Luther Phelan throwed his hand on his gun and Moore broke and run out of the door. Louey Thompson was standing like he was paralyzed. Like he was deaf, dumb and blind, with a quarter in each hand, just like that. This was my money. When I shot, Luther wheeled and went out of the front door. I don't know what became of his pistol. He had it the last time I saw him. He had it in his hand. I knew there was a rear side door there and I didn't want Luther Phelan to run up Franklin Street and come in this side door and shoot me from behind, and I walked out, and after I saw him pass that rear side door I came back, walked up to the bartender, and said, 'Thompson, give me my money. The drinks are off. I wouldn't spend another cent in this house,' and I got my money and went out. At that time I did not know that I had struck him. I didn't know whether I had hit him or not. He didn't fall when I shot. I was holding my pistol with my hand. I just pulled it out and shot like that. It was a double action gun. I went out of the place and walked up to the St. Charles. I walked up Fifth Street as far as the alley between Franklin and Austin Streets, and went down the alley and went into the St. Charles at the back door. When I got in the St. Charles George Cook was sitting

down at the table writing.  There was not any one else in the house.
So I walked to the rear end of the bar and stuck the gun in there.
Cook was still writing and I came back and said, 'Come on, George, let's
get a drink.'  He quit writing and came on and took a drink with me
and while we were standing talking and drinking Ed Costley came in.
Ed Costley is an officer in town.  I surrendered to Ed, and at the time
I surrendered I did not know that I had hit Phelan.  I didn't have
any intention when I went to that saloon to have any trouble with
Phelan.  I had no more idea of having trouble than I have of jumping
out of this window at this very moment.  I went there as a matter of
friendship because I liked the man, and we had always been good
friends, and he was a brother Eagle and just started up in business,
and I went around there and spent my money just as a friend and
nothing more.  The Eagles to which we belong is a secret order here
in town, a fraternal order.  We both belonged to the lodge.  We call
it an aerie.  He had only been a member a short time before his death.
I had never had any difficulty or unkind words of any sort with Luther
Phelan that caused me to go around there and try to kill him.  I never
did.  *The reason I went back, and the only reason I went back, was to
explain to him why I had been there with Bud Dunn.*  That if they
had had any trouble or quarrel I didn't know it, or else I never would
have brought him around there.  Bud invited me to go around there
the first time, and the second time I went around to explain myself
for being there.  I knew Bud Dunn had been working around there,
and thought may be he had got fired, or had some misunderstanding
with him, and they were not friends, just from the remarks he made
when I asked him to drink with us.  I didn't want him to shoot me, and
that is why I shot.  His every action showed it.  The last words Luther
Phelan said to me before I shot were, 'If you say or even think that I
am crazy, you G— d— one-eyed s— of a b—, I will kill you,' and then
threw his hand back.  That was the last words I ever heard him speak,
and he was then standing in the door, the screen door.  Just out in
front, right in the screen door.  When he was talking he wheeled around
to me and threw his hand back this way and was standing right over
there to me."

Bill of exceptions number 1 shows that the State placed Mrs. Walter
A. Phelan, sister-in-law of deceased, upon the stand, and the State asked
her the following questions:

"Q. When the deceased stepped in what was his appearance?  A.
Well, when he stepped in he just looked like he was suffering death.
Q. Suffering death?  A. Yes, sir; an expression I shall never forget.
Defense:  We object to that.   Q. What was that expression?  Defense:
We object.  A. It was one of pain."  Appellant to all the foregoing
objected on the ground that the same was tragic relation of collateral
facts, and were immaterial and hearsay, and involved the opinion of
the witness as to whether deceased was suffering or not, and that the
witness had never seen such a thing before in her life; that it was only

an expression of feeling on the part of the witness in the case and cast no light upon any facts and developed no issue in the case that could be of any relevancy in deciding the question at issue. All of the objections were overruled except as to this portion, to wit: "An expression I shall never forget," which statement of the witness was excluded by the court and the jury instructed not to consider same. The court appended to the bill this explanation: "I will state that it was shown that the deceased, immediately after he was shot, walked directly from his place of business to his residence, about five blocks, and the evidence objected to above related to his appearance when he arrived there. It was also shown that when he arrived there he was not armed and counsel for the defendant, in the examination of other witnesses, had attempted to show, at least by intimation or insinuation, that the deceased might have made way with his pistol, or disposed of the same, between the place he was shot and his residence, and the evidence as to his physical condition at the time he arrived at his residence was admitted as a circumstance that might be considered by the jury in determining whether or not the deceased was in such mental condition that he would think to dispossess himself of a pistol before reaching home, and as a circumstance which the jury might consider, it occurring so shortly after he was shot, in connection with other evidence, as to whether or not he was armed at the time of the shooting, as contended by the defendant." The immediate personal appearance of the deceased immediately after the difficulty as shown in the explanation could be testified to by a witness. Under the facts stated by the court we believe the testimony was admissible.

Bill of exceptions number 2 shows by the same witness that the witness met deceased and that when he stepped in he just looked like he was suffering death, and that said expression was one of pain, and the court, in ruling upon said proposition, made the following statement: "I think myself that portion of it, the effect that it had upon her, is not admissible at all. I think though that the statement of the witness that he seemed to be suffering very greatly, suffering great pain at that time, that that had already been stated by the witness, I think that is admissible." Thereupon, the following colloquy occurred between the court and counsel for the defendant:

"The defense: 'Upon what theory?' The court: 'Upon the theory as to whether or not the deceased, if he had a pistol at any time after the shooting, would be in a condition of premeditation or otherwise so as to dispose of that pistol, and not have it on his body when he got home. It is a circumstance I think that may go to the jury for them to consider in connection with that inquiry.' Defense: 'Certainly it does not throw any light on the question of what became of that pistol, because a reasonable supposition would be that if he had a pistol at the time that he was shot that he dropped it, and it was made away with by somebody else. There were opportunities there to do it.' The court: 'That is a circumstance that might have some bearing as to

whether a man in that condition would have that much premeditation.' Defense: 'Well, the court and counsel for the State have raised an issue that we have not raised in the case.' The court: 'I do not think the court has raised any.' Defense: 'I mean the court has intimated that the State has raised an issue that we have not.' The court: 'No. You asked the court upon what ground the court thought it would be admissible, and through politeness to you the court explained to you the reason for the ruling.' Defense: 'Well, we reserve our bill to the evidence.' Defense: 'Also to the remarks the court just made as being comments on the weight of the evidence.' The court: 'The court will just state this: First, the jury are instructed that the remarks of the court shall not influence you at all, and you are instructed to disregard them in toto, and I will ask counsel in the future not to ask the court why it makes any ruling upon any ground, or to make any explanation to counsel at all, because the court might inadvertently, in making these explanations, go beyond the true ground, and it does not wish to be invited to do that.' " Clearly, under the explanation of the court, none of the matters complained of were error.

Bill of exceptions number 3 shows that while Mrs. Walter A. Phelan was upon the stand, the State asked her the following questions: "Q. What was the condition of his (deceased) clothing as to anything on it?" The defense objected to testimony of anything that was on the clothing of the deceased, and the witness undertaking to describe the clothing as the same and all the same had no relevancy here, which objection was heard by the court and in all things overruled, and said witness was permitted to state and testify and did state and testify before the jury, as follows:

"A. His pants, this side, was saturated with blood and it was oozing out of his pants and dripping. This side of his pants was not so bad any further down than the knee." Appended to the bill is the following explanation: "That on the morning following the shooting a trail of blood was found leading from the place of the shooting, five blocks directly to the residence of the deceased, where he was met by Mrs. Walter Phelan, his brother's wife, on arrival there, in response to a call made by deceased in his yard, and the foregoing evidence was admitted as a circumstance to show that deceased was in condition to make and leave said trail of blood as he walked home, and his own knowledge of his condition, and as a circumstance to be considered in determining whether or not he was in such mental condition of premeditation as would cause him to dispose of his pistol, if he had one, at the time of the shooting, before he arrived at his residence." It occurs to us the testimony is res gestæ, occurring as the bill shows, or at least the bill does not exclude the idea that it is res gestæ; if it was, then the condition of the deceased immediately after the shooting could be testified to, also the condition of his clothing. It is also, as the court in his explanation suggests, admissible in order to show the mental condition of the deceased and thereby preclude or be a circumstance

to indicate that he did not dispose of a pistol, the State's theory and evidence in this case being that deceased did not have a pistol at the time of the shooting.

Bill of exceptions number 4 shows that while Mrs. Luther Phelan was upon the stand the State propounded to her the following question: "When were you and deceased married?" to which appellant excepted on the ground that the date of the marriage of witness and deceased was immaterial. The witness answered, "On the 20th day of December, 1905." There is nothing in the bill to show how or in what way it was immaterial, and a general objection of this character will not be considered by this court unless the evidence would be immaterial for any purpose. We cannot so say. However, the court appends to the bill this explanation: "This evidence was admitted in connection with other evidence of the witness as to whether or not the deceased had or owned any pistol at the time he was killed, and to show the opportunity of knowing and the length of time such opportunity had existed, on the part of the witness, to know whether or not he owned any pistol at that time." Clearly, with that explanation, the testimony would be admissible.

Bill of exceptions number 5 shows that the State placed Louey Thompson upon the stand, and proved by him that there was no pistol in the saloon of deceased at the time he was shot by the defendant, and that there had never been one there, and that the deceased did not have a pistol at the time he was shot; and said witness denied on cross-examination that he had, at the time and place given, stated to John Doud that after the shooting he went to the drawer in the saloon to look for the pistol, and that the same was not there; and that he did not know whether deceased had the pistol at the time he was shot or not. Thereupon the defense placed his witness John Doud upon the stand and proved by him that he had a conversation with the said witness Thompson on the morning after the shooting, and that said Thompson stated to him in said conversation that when the shooting occurred he went to the drawer in the saloon for the pistol and that it was not there, and that said Thompson did not know whether deceased had a pistol at the time he was shot or not. And, thereafter, the court permitted the State to prove by said Doud on cross-examination that he, Doud, in conversation with Walter Phelan had told him that Kid Humphries had told him (Doud), that there was some money in it, and that he (Doud) had told Humphries that Louey Thompson would not have anything to do with it, which testimony was admitted by the court without any objection by the defendant, and after the witness had so testified the defendant objected thereto on the ground that the same was hearsay, incompetent, and irrelevant, and could not in any way bind the defendant, which objections were overruled. Whereupon the witness was asked the further question: "If he (witness) did not tell Walter Phelan that he (witness) told Kid Humphries at the time that they could not put enough money in the city hall to buy Louey Thomp-

son? A. I said there that I did not think they could do anything if they would offer all the money in the world. That is the very words I said. Q. That was your conversation with Kid about buying Louey? A. Kid told me there was some money in it. I said Louey ain't going to have nothing to do with it.' That is all." Thereupon the defendant renewed the objections and the further objections that the witness' endorsement of Louey Thompson had nothing to do with this case. Whereupon, the court sustained the objections and excluded from the consideration of the jury all that part of the testimony wherein he testified that he told Phelan, in substance, that he had told Kid Humphries that there was not money enough in the world to buy Louey Thompson; and thereafter, the court in his charge withdrew all questions to and answers by the said witness Doud relating to the subject matter of this question, and instructed them not to comment upon, not consider the same for any purpose whatever in arriving at a verdict. Certainly under the explanation of the court, there is no legal basis for complaint under this bill.

While the State's witness Louey Thompson was upon the stand, bill of exceptions number 6 shows that on cross-examination by the defense the witness denied that he had stated to Moore, another witness for the State, in said saloon, a short time after the shooting of deceased, and in the presence of Frank Harmon, in substance, that they were the only eye witnesses to the shooting of deceased, and that they must get together and remembered their bosses. And thereafter the defendant put his witness, Frank Harmon, upon the stand, and proved that in said saloon a short time after the shooting, he heard the said witness Thompson state to said witness Moore in substance, that "we would have to get together, and stay together on the same proposition, and we would have to respect our bosses," which was all the testimony adduced by the defendant from said Frank Harmon.

Thereupon, on cross-examination by the State, the following questions were propounded and answers made:

"Q. Didn't you tell Dud Dollins when he came to you with the bill on the street that you were getting up evidence for Mark Rice in the Mark Rice case, and he was going to pay you a lot of money and then you would pay it? A. No, sir. Defense: Note our exception. Q. Right down here on the street he came to you with a bill and you told him that? A. No, sir; he never did come to me with a bill at all. Defense: Note our exception to that question. Witness: I owed him $10, as far as that is concerned, if that is what you want to know. Q. Didn't he come to you for it? A. He asked me for it, yes, sir; I told him, 'I will go and get you what I can.' I got $4 and paid it to him. Q. Didn't you tell him (Dud Dollins) at the time he came to you with the bill that you were getting up evidence in the Rice case and when they paid you you would pay the bill? A. No, sir. Defense: Don't answer that. Witness: I have done answered it. I did not tell him anything of the kind. Defense: We object on the ground that it

is immaterial, irrelevant, hearsay, and. a conversation, if it ever occurred, which he says it did not, in the absence of the defendant, about which the defendant has no knowledge, and could not have any knowledge, or any agency, and it cannot be introduced in evidence to be used in this case against the defendant. The State: Not against the defendant? The court: No, it is not evidence against the defendant at all, and the jury cannot consider it as evidence against the defendant, and the court so instructs them now, that they cannot consider it as evidence against the defendant, only in regard to the credibility of the witness that is upon the witness stand and testifying. Defense: We except. We are excepting to the remarks of the court upon the evidence. The court: The court is attempting to limit the evidence. Defense: We except to the language of the court in giving his reason for admitting the evidence, on the ground that the statement of the court is upon the weight of the testimony. The court: I will state this, then, that I will withdraw those remarks and instruct the jury not to consider them, and I will attempt in my charge to frame the instructions to the jury, and then it will be in position that it may go to the higher courts. Defense: We except to that last remark of the court. The court: What is that? Defense: The stenographer has it.. The court: Will you please tell me the remark you excepted to? Defense: No, sir. I do not desire to repeat it. The State: I will call the court's attention to it, about the case going to a higher court. The court: Well, gentlemen, I instruct you that you are not to consider, not to be influenced by the remarks that the court makes to counsel in the decision of these questions. The court has instructed you heretofore about the remarks of the counsel and the attorneys, and the colloquy that passes between the court and the counsel is not evidence before you for your consideration at all in the trial of this case. You will not consider it in any way whatever. You will be guided entirely and exclusively by the evidence in this case."

And thereafter the court in his charge withdrew all questions to and answers of the said witness Harmon relating to the subject matter of this exception, and instructed them not to comment upon nor consider the same for any purpose whatever in arriving at a verdict. Defendant was arrested directly after the shooting and has been in jail since then, and no evidence connected him with the offer, if made. In the first place, there was no testimony given injurious to appellant; the witness denied any such conversation, and certainly the bill as copied in detail shows there could be no harmful error.

Bill of exceptions number 7 shows that the State placed the witness Louey Thompson upon the stand and propounded to him this question: "During that entire time (referring to the thirty or thirty-five years the witness had lived in Waco) have you ever been into any trouble of any kind?" to which appellant objected. The witness answered, "I never was." Appended to the bill is this explanation: "In the first place the defendant in objecting stated no ground upon which to base

his objection, and it seems the defendant had laid a predicate to impeach said witness by proving contradictory statements, and had sought in many other ways to discredit him before the jury by proving his business and the character of business he was engaged in, and his habits as to sobriety, but had not sought to impeach him by the introduction of any testimony concerning his ever being arrested or indicted for crime." The bill is totally defective in not stating any grounds of objection, and hence cannot be considered.

Bill of exceptions number. 8 shows that appellant placed E. C. Conant upon the stand, who testified to material facts for the defense. The State upon cross-examination asked said witness, after having shown that said witness had worked immediately after the killing of deceased with a man named Muldoon, and that he did not tell Muldoon anything about the shooting, the following questions:

"Q. He talked about it, didn't he? A. Yes, sir; he told me about hearing it. Q. Muldoon told he heard that Phelan was shot by Rice? A. He told me he heard that Phelan was shot. Q. And didn't he say that there was a great deal of—they were wondering whether Phelan would get well or not. A. I disremember whether he said that or not. Q. Didn't you hear that during the week? Defense: We object to what Muldoon said or anybody else said. Q. I am not asking what Muldoon said now. Didn't you hear it during the week? Defense: We object to what he heard. Objection overruled and defendant excepted. Q. You heard during the week that Phelan was still living, did you not? A. I think I did. I am not really sure. Q. You heard they took him to the sanitarium, did you not? A. No, sir. Q. You did not? A. No, sir. Q. You heard he died, did you not? A. Yes, sir; I heard he died. Q. You heard the day he died, didn't you? A. Yes, sir. Q. You heard each day between Sunday and Thursday, I believe it was that he died, did you not? A. No, sir; not every day. Q. Well, nearly every day? A. Something near every day; yes. Q. You and Muldoon were there side by side? A. Yes, sir. Q. During those long days? A. Yes, sir. Q. Why did you finally decide to tell your wife? Defense: We object as irrelevant. Objection overruled. A. I don't know why. I just finally decided to tell her. That is all I can tell you. The witness then testified that he thought a great deal about whether he should tell his wife, and was then asked: Q. But after awhile your bosom would not contain the secret any longer, and you decided to tell her, and you did not decide to do that on impulse? Defense: We object to all these questions as irrelevant and argumentative. Objection overruled. A. I do not thoroughly understand the meaning of that word. Q. Well, you did not decide of a sudden to tell her, but you thought about it a great deal? A. Yes, sir. The witness then testified that when he told his wife he asked her not to say anything about it, and made that request because he did not want to be a witness in the case, and was then asked: Q. Why didn't you want to be a witness? Defense: We object as his reason has nothing to do with

this case. Objection overruled. Q. Why didn't you want to be a witness? Human life had been taken. A man is charged with murder, to be tried in the courts for his life, his own life. Why didn't you want to be a witness and come and tell the truth, if you knew about it? Defense: We object as argumentative. Note our exception to the line of questions. Objection overruled. A. Simply because I did not want to be a witness." Appended to this bill is this statement: "This bill is not full enough for the ruling of the court to be understood, but is correct as far as it goes, and is allowed with the explanation that in my opinion the matters complained of cannot be fully understood unless considered in connection with the cross-examination of said witness immediately before and after, and the same is added hereto as a part of this bill." The State's counsel after crossing the witness as to what he saw of the brewing difficulty before he ran away from it, proceeded upon a long and lengthy examination which, in conjunction with that above detailed, shows that the State's counsel was attempting to show that the witness' testimony had been concealed, as a circumstance to show its lack of verity. We think the examination was germane to the testimony testified to by the witness, and his efforts to concede the fact that he was a material witness is a potent circumstance to indicate the improbability and lack of verity in his testimony.

Bill of exceptions number 10 shows that the State placed Dr. A. M. Curtis on the stand, who testified that deceased died on Thursday evening after the shooting on Saturday night, and the wound inflicted by said shooting caused his death. The State then proved by said witness as predicate for the introduction of the dying declaration of the deceased, "that the deceased was hopeful, very hopeful, all along, and made a hard fight, but that just a short time before his death, the witness was in the room where the deceased was and ten or fifteen minutes before he died deceased said he was going to die, and asked me to send for his family; that the witness then sent for the members of deceased's family who were in the same building; thereupon, deceased told his family that he was going to die, and told them good-bye; told his brothers to be good men, and meet him in heaven, and not to hurt anybody, and that he expressed the thought to his wife that he was going to die, and told her good-bye, and kissed her, and that he (deceased) would forgive the man who shot him, and that he died about ten minutes after; that the witness thought the deceased was sane, that he seemed to recognize everybody and talked very sensible up to the time he got so he could not speak. The foregoing was all the predicate laid for the introduction of the dying declaration of the deceased." The State then asked the witness the following questions:

"Q. Very well, Dr., state to the jury what, if anything, you said to him, and what, if anything, he said to you with reference to the circumstances under which he was shot. A. I asked him was he armed when he was shot." The defendant objected on the ground that the witness was detailing the answer of the deceased to said question on the

ground that no proper predicate had been laid; in that the question asked the deceased by said witness as before detailed is a leading question." The court overruled the objection and permitted the witness to state what the deceased said in reply to said question, and permitted the witness to testify before the jury as evidence in this case that the deceased stated in answer to said question that he was not armed.

Bill of exceptions number 11 shows that while the same doctor was upon the stand, and the State had laid the predicate as shown by bill of exceptions number 10, the State proved by said witness before the jury, as evidence in this case, that all the family of the deceased came in response to a message from said witness Curtis; that there were three brothers, two sisters-in-law, and the wife of the deceased, and that the deceased told them that he was going to die, and told them good-bye, and the deceased told his brothers to be good men, and meet him in heaven, and not to hurt anybody, and told his wife good-bye, and kissed her, and said that he forgave the defendant, and died a few minutes after; and on further examination of said witness, it was made to appear by testimony of said witness that all the facts recited herein occurred after the deceased had made the alleged dying declaration, and the said alleged dying declaration, as testified to by said witness Curtis, was made before said family arrived. The defendant, when such fact was made to appear by the testimony of said witness, moved the court to exclude same, because irrelevant, immaterial and prejudicial, and having a tendency to prejudice the defendant before the jury, and that the same did not illustrate any of the facts of the killing, and because the same and all the same was shown to have occurred after his alleged dying declaration, and did not and could not tend to illustrate the condition of his mind at the time he made the declaration introduced in evidence. This bill is allowed with this explanation: "The deceased, as shown by the evidence, did not believe that he was going to die until about ten or fifteen minutes before his death; that he then told the doctor that he was going to die, and asked that his family be sent for, and while the nurse had gone into another part of the building to bring in the family, the dying declarations as testified to by this witness were made, and while the same were being made the family came in, and with them, or immediately after them, Dr. Black, another one of the attending physicians; that these declarations or statements that are here objected to occurred immediately upon the entrance of the family into the room, and that either while they were being made, or just after that, he made other declarations to Dr. Black, as shown by the record, about to the same effect, or to Walter Phelan, in Dr. Black's presence, which were a part practically of the same conversation in which all his dying declarations were made, and were admitted as tending to show that he realized that he was dying, and as tending to show his mental condition at that time as to sanity."

Bill of exceptions number 12 shows that the State placed Dr. A. M. Curtis upon the stand for the purpose of laying a predicate for

the introduction of the dying declarations of the deceased, and as a part of said predicate, stated that the deceased, shortly before his death, told his three brothers to be good men, not to hurt anybody, and to meet him in heaven, and that the deceased forgave the defendant, and it afterward developed that all the same had occurred after the alleged dying declaration testified to by the said witness. The defendant moved to exclude the same from the jury on the ground that the same, and all the same was irrelevant, immaterial, and prejudicial, and would tend to prejudice the defendant before the jury, and that the same did not illustrate any fact of the killing, and the same was no part of the necessary proof of a sense of impending dissolution, and the court stated that he would exclude the same, as before stated, from the jury, but did not do so. To which action and ruling of the court, and the failure to specifically exclude said testimony from the jury, the defendant here tenders his bill of exceptions No. 12, and prays that the court allow the same, and order the same to be filed as part of the record in this case. This bill is refused with this explanation: "The foregoing evidence which is objected to is a part of the same as contained in defendant's bill of exceptions No. 11, the objection being to only a part of said statement, it having occurred, as stated in explanation to bill No. 11, all within ten or fifteen minutes immediately preceding the death of the deceased. All of said evidence had been introduced without objection before the defendant asked that the jury be retired that the matter might be discussed before the court. After the jury was retired and the matter being thoroughly discussed before the court, the defendant after making the objection to all the evidence as contained in bill No. 11, then made in the absence of the jury the motion to exclude the evidence as contained in this bill, and, as shown thereby, the court sustained the motion to exclude the same. Sometime thereafter, the matter having taken some time in discussion, the jury were recalled, and the witness further examined in regard to said declarations, and the circumstances under which they were made, and the matter of the ruling which the court made in the absence of the jury in excluding said evidence was not called to the attention of the court by defendant's counsel, and after the jury returned, no request was made of the court to instruct the jury not to consider the same, or to withdraw the same in accordance with the ruling that had been made during the absence of the jury; and the ruling of the court on the motion not having been again called to the mind of the court was overlooked and not called to the attention of the court so that the jury could be given any further instruction thereon. In other words, defendant's counsel having obtained in the jury's absence a ruling in his favor excluding the evidence, rested their case there after the jury were returned, and did not call the court's attention to the matter thereafter, or request that the court instruct the jury not to consider the same, and no exception was then or at any other time during the trial taken to the failure of the court to withdraw the same from the jury, or to instruct them not to

consider it.  No exception being taken to the action of the court during the trial, this bill is not allowed, but is ordered filed as a part of the record in this cause, the facts appearing above." Clearly, with this explanation, appellant has no legal basis for complaint. In many cases we have .held that it is only the dying declaration that is admissible. Extraneous facts or circumstances that would merely serve to inflame the mind of the jury or throw no light upon the admission of a fact as to whether the declaration was a dying declaration or not are never admissible, but would be pure hearsay.  However, under the explanation of the court, in the absence of the jury, he agreed to exclude the testimony, but appellant's counsel failed or refused to make the motion to exclude it.  Failing in this, we hold that they waived any exception thereto.

Bill of exceptions number 13 shows that the State placed Dr. Black upon the stand, who testified that the first thing he heard deceased say on the question of his approaching death was to ask the question if the window was open, and that he examined it, and stated to the deceased that it was wide open.  The witness then asked the deceased if he breathed well, and deceased said no, he could not.  The witness then gave deceased a hypodermic to make him breath better, and that shortly thereafter deceased said: "It is hard to go after pulling along as far as I have."  The witness left the room, and shortly returned and said: "Mr. Phelan, do you feel like you are alright," and that the deceased replied thereto: "Yes, doctor; I think it is all well with me."  Some one suggested that deceased referred to his spiritual condition, and he asked deceased if he thought he was going to get well.  The deceased replied: "No; I am going now."

That afterward deceased told his brothers good-bye, and stated that he knew he was dying, and told his wife good-bye several times.  The foregoing was all the predicate attempted to be laid by this witness for the introduction of the dying declaration of deceased.  The said witness was then asked whether or not he heard the deceased make any statement to Walter Phelan, a brother of the deceased, and he answered that he did, and said witness was then asked what Walter Phelan said to deceased, and witness stated that Walter Phelan asked deceased: "Were you armed?"  The defendant objected to the witness stating what the answer of the deceased was to said question, on the ground that it is an answer to a question calculated to make the deceased make a particular statement.  The objection was overruled by the court and the deceased answered "No."  This bill is allowed with this explanation: "The question testified to by the witness Black asked by Walter Phelan of the deceased, above objected to, and his answer thereto, were made after the family had come into the room of the deceased when sent for by Dr. Curtis, as explained in bills of exception Nos. 10 and 11, and were a part of what occurred during the last few minutes of the life of the deceased, as stated in said bills."  Under the explanation

of the court in this bill and in bill number 12, this testimony was admissible.

While appellant was on the witness stand in his own behalf, the State on cross-examination asked him the following questions:

"Q. You know John Majors? A. Yes, sir; I know him. Q. Intimately? A. Well, not so intimately. Q. Well, say so. A. Yes, sir. Q. You have run together, haven't you? A. Oh, yes. I have run with him. Q. Is he any relation to you? A. No, sir. Q. Not remotely, in any way? A. No, sir. Q. You have known him a long time? A. Yes, sir. Q. Been to see you in jail? A. Yes, sir. Q. Several times? A. Yes, sir; twice, I think. Q. Talked with you about your case? A. No, about all he said was— Defense: We object to what occurred in jail. The State: I am not seeking to know what was said. Defense: We object to his showing anything about who came to see him in jail, or who talked with him in jail, while he was under arrest, because it was the privilege of the defendant. Being under arrest, consultations with his friends, actions of his in jail, what happened there, are all on the same plane with statements; verbal acts as well as spoken words are excluded. The objection was overruled. Q. The question is this. - Did he talk to you about your case? A. He only said that he was sorry that I was in trouble, and not to say anything, but to keep my mouth closed, to say nothing only to my attorneys. Q. That was his advice? Defense: That is excepted to. The court: The question did not call for the answer that was given. The State: We are willing for the particular remarks to be excluded, but simply the fact that John Majors talked with him, and advised with him about his case. Q. Did he talk with you about the case, didn't he? A. He did not say anything only that he was sorry I was in trouble. The court: The court will exclude the answer that was made by the witness in stating what was said, because it was not asked for. Defense: He asked if John Majors talked to him. The State: That could be answered with yes or no. Defense: He asked if John Majors talked to him about his case, and, of course, he expected him to state what he said. The court: Either yes or no. Defense: Our bill goes to the whole matter. The court: Very well. Q. Now answer the question yes or no. He did talk to you about your case? No, no talk about it. Q. He mentioned your case? A. He mentioned it; that is all. Q. He did advise you—say yes or no. A. Yes. Defense: We object. The court: The objection will be overruled. Defense: We except. Witness: He advised me not to say anything to anybody. The State: Now the witness injects— The court: That is a voluntary statement on the part of the witness, and was not asked for. The State: And has been excluded from the jury and is now, I presume? The court: Yes. Defense: Note our exception." In explanation of this bill it is shown that John Majors was not a witness in this case, and was neither called to the stand by either party, nor did he testify for either party, nor against either party in this

cause. The bill does not show what was the ground of objection or how it was prejudicial to appellant.

Bill of exceptions 15 shows that the State had proved by its witness, Louey Thompson, that said Thompson was an employee of the deceased at the time of the shooting, and that he was an eye-witness to the shooting, and that there was no pistol in the saloon at the time, and that the deceased was not armed at the time he was shot, and had nothing in his hands, and other facts material to the State's case. Thereupon, when the defendant was on the stand as a witness in his own behalf, and had testified on cross-examination that he was watching the situation, because it looked like a framed up thing for deceased to murder defendant, and the defendant was watching both and was not watching one man, but was watching all who were in the saloon, when the State was permitted, on further examination, over the objection of the defendant, to allow the said defendant to be asked the following questions, and to make answer thereto, and the defendant did make answer thereto over the objection of defendant, which questions, answers and objections were as follows, to wit:

"Q. Then it passed through your mind that Louey Thompson, who was standing there, with his hands up, wanted to murder you. A. No. Q. Harmless old Louey Thompson? A. I didn't say he did. Q. You know that he never did wish any mortal any trouble, don't you? Defense: We object to that question. I want a ruling on whether that question is proper or not. The State: We will pass it by. Defense: No; I ask that the jury be instructed to disregard the question. The State: If counsel want to take up the time, I ask this question: If he did not know Louey Thompson's harmless character, the man that he says framed up the murder. Witness: I did not say he framed up the murder. Defense: We object to that because he made no such statement and no such intimation; on the further ground that it is not the proper way to bolster up their witness Louey Thompson. It is not legal testimony to undertake to show what his reputation was, or bolster him up in any such way as that, and on the ground that it is argumentative. The Court: The objection is overruled. Defense: Note our exception." The questions and answers immediately following the above were:

"Q. You say now that at that time you thought they had framed up a plot to murder you? A. I don't know what they were doing. Q. You say you thought that? A. When I saw what Luther Phelan did, yes. Q. Whom did you think framed the plot? A. I knew that Luther Phelan was going to do it, going to try to do it, and I didn't know but what somebody else might take it up with him, help him. I didn't know." We see no objection to this cross-examination. The bill shows that defendant said they had framed a plot to murder him. The deceased was present, of course, when he was murdered, and Louey Thompson was his clerk and employee in the saloon at the time,

and it was proper for the State to ask if the defendant thought Louey Thompson was in that plot.

The charge of the court on implied malice is, as follows: "The next lower grade of culpable homicide than murder in the first degree is murder of the second degree. Malice is also a necessary ingredient of the offense of murder in the second degree, the distinguishing feature, however, so far as the element of malice is concerned, is: that in murder of the first degree, malice must be proved to the satisfaction of the jury, beyond a reasonable doubt, as an existing fact, while in murder in the second degree malice will be implied from the fact of an unlawful killing.

"Implied malice is that which the law infers from or imputes to certain acts however suddenly done; thus when the fact of an unlawful killing is established, and the facts do not show express malice beyond a reasonable doubt, nor tend to excuse or justify the act as herein charged, then the law implies malice, and the murder is in the second degree; and the law does not further define murder in the second degree, than if the killing is known to be unlawful and there is nothing in evidence on the one hand showing express malice, and on the other hand there is nothing in evidence that will reduce the killing below the grade of murder, then the law implies malice, and the homicide is murder in the second degree.

"Every person is admitted by law to defend himself against any unlawful attack, reasonably threatening injury to his person, and is justified in using all the necessary and reasonable force to defend himself, but no more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against any unlawful and violent attack, made in such a manner as to produce a reasonable expectation or fear of death or some serious bodily injury.

"If you believe from the evidence, beyond a reasonable doubt, that the defendant, with a pistol, the same being a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, and not in defense of himself as hereinafter charged, with the intent to kill, did with implied malice as herein defined, unlawfully shoot and thereby kill Luther Phelan as charged in the indictment, and in so doing did not act under the immediate influence of sudden anger, rage, resentment, or terror, arising from adequate cause,—that is, such cause as would commonly produce such passion in a degree that would, in a person of ordinary temper render the mind incapable of cool reflection,—then he would, in that event, if you so find, be guilty of murder in the second degree; and if you so find you will find him guilty of murder in the second degree, and assess his punishment at confinement in the State penitentiary for any period that the jury may determine, and state in their verdict, provided it be for not less than five years." We think this charge is correct.

Appellant also criticises the charge of the court on self-defense, but

the same is in stereotyped form a charge on real and apparent danger, and approved by this court in many cases.

Appellant further objects to the charge of the court on the ground that it did not charge article 713 in relation to threats. The evidence in this case does not raise that issue.

Appellant's 42nd ground in his motion for a new trial, complains that the court erred in failing to charge the jury specifically on the law of cooling-time as applicable between first and second degree murder, for the reason that the evidence in this case raised the issue, and showed if the contention of the State was true, that the defendant became angry at the insulting words and conduct of the deceased towards him upon their first meeting in the saloon, and the State contends that he immediately armed himself, and returned to the saloon for the purpose of killing the deceased, and the State's testimony all tended to show that such return to the saloon was very shortly after the first meeting, and the testimony of the witness Thompson places it at about fifteen minutes. Conceding that the issue of cooling-time applies between murder of the first and second degree, yet we do not believe the evidence in this case called for such a charge. The evidence for the State and defense shows that appellant was not offended at the first meeting. The witness Doud testified to that effect. The defendant himself testified that "the reason and only reason I went back was to explain to deceased why I had been there with Bud Dunn." Upon this theory that he went back there to give an explanation, the court gave to the jury, at the instance of appellant, the following special charge:

"If you should believe from the evidence that the deceased and the defendant met on the night of the killing and that disrespectful or insulting words were used by the deceased towards defendant, and that they then separated; and if you should further believe from the evidence that the defendant procured a pistol after such separation and returned to the saloon of the deceased for the purpose of making an explanation or seeking a peaceful adjustment of the differences, if any, between them, you are instructed that the defendant had a right to arm himself and to seek the deceased for such purpose of explanation or peaceful adjustment of their differences, if any, and if you believe from the evidence that after his return for such purpose, if you find such was his purpose, the deceased used objectionable or insulting language to the defendant; and if you further believe from the evidence that the defendant then and there became angered or enraged on account of anything said or done by the deceased at the time, whether such anger or rage, if any, was warranted by the circumstances or not, and that by reason of such anger or rage, if any, the mind of the defendant was not at the time cool, deliberate and sedate, and that in such frame of mind the defendant formed the purpose of shooting the deceased and then and there executed such purpose, or if you have a reasonable doubt thereof, then you are charged that the defendant, if you so find, could in no event be guilty of any higher grade of offense than murder in

the second degree, and you will acquit him of murder in the first degree." This being the condition of the record, it could not possibly have injured appellant, in view of the fact that this charge was given, and in view of the very full charge of the court on murder in the second degree, to fail to charge on cooling-time, even conceding that the issue was in the case, but we do not believe that the issue was in this case, since the record before us shows that appellant was not angry at the first meeting, and there is no witness that swears that he was angry at the first meeting. Therefore, we do not believe the court erred in failing to charge on the issue of cooling-time.

Appellant's 43rd ground in motion for new trial complains that the court erred in failing to charge on manslaughter. In the light of the record before us, we do not think this charge was required by the evidence. Various other questions are raised by appellant in his assignments of error, but we have treated nearly all of them, and must say that we think that this record is without any error requiring a reversal of this case. The evidence shows cruel and wanton murder, and the jury were amply warranted in their verdict, and the judgment is affirmed.

_Affirmed._

### ON MOTION FOR REHEARING.

#### June 26, 1907.

HENDERSON, JUDGE.—This case was affirmed at the Dallas Term, and now comes before us on motion for rehearing. Appellant's brief covers most of the salient features discussed in the original opinion, and takes issue with the court as to the correctness of its rulings thereon, and besides he raises some questions not treated in the former opinion.

We do not deem it necessary here to re-state the testimony as included in the original opinion, as the statement of the evidence of the two witnesses, Louey Thompson for the State, and appellant, on his own behalf, sufficiently stated the essential features of the case.

We note in the original opinion, in treating bills of exception Nos. 1 and 2, no stress was laid on the remarks of the court in admitting the testimony of Mrs. Walter Phelan as to the appearance of deceased when he came to her residence a few minutes after the homicide. The court appears to have permitted the testimony, as he stated to counsel, as to the condition of deceased at the time he came to said house, and the impression his appearance produced on the witness, because it would tend to show that deceased was not in a condition of mind to have disposed of any pistol he may have had in the interim between the time of the shooting at the saloon and when he appeared at the residence of Walter Phelan. Exception was taken to the remarks of the court in the presence of the jury, and a colloquy ensued between the court and counsel for appellant, and in the finale the court instructed the jury to disregard his remarks in toto, and thereupon requested counsel not to ask the court in future as to its reasons for making its rulings.

Appellant insists that not only was the testimony inadmissible, but the remarks of the court were hurtful to appellant. On reconsideration of the matter we are inclined to the view that the impression produced on the witness Mrs. Walter Phelan was not admissible in testimony. No question was made as to the fatality of the wound, and that he had the appearance of death when he came to the house was immaterial. Moreover, the fact that deceased was very bloody when he came to said residence would serve to illustrate no issue in this case, and might be calculated, under the circumstances, to have inflamed the minds of the jury. .The remark of the court as his reason for admitting said testimony furnished no reason for its admission, and was calculated to impress on the jury that the court believed it was very material testimony, showing that deceased had not disposed of any pistol which he may have had at the time of the shooting. The direction to the jury to disregard the same may or may not have cured the error. Nor do we think it was material to show how long deceased had been married to his wife. We would not be understood as holding that the above testimony would be of a reversible character, but as far as we are able to discover it serves to illustrate no issue in this case.

Bills of exception Nos. 10 and 11 relate to dying declarations of deceased. We believe that the testimony of Dr. Black constituted a sufficient predicate for the introduction of said dying declarations. This witness testified that deceased held out several days after the infliction of the wound, which he received on Saturday night, and died on Thursday evening following; that he seemed very hopeful all along, and made a hard fight, but just a short time before his death the witness was in the room where deceased was, and ten or fifteen minutes before he died deceased said he was going to die, and asked the witness to send for his family. We think this was sufficient testimony on which to predicate the introduction of his dying declarations, and that it was admissible for him to state the circumstances connected with his being shot by appellant, although the question put to him by the doctor that he asked him if he was armed when he was shot may appear to be somewhat leading. We do not think it suggested the desired answer, but merely served to call the witness' attention to the matter of whether or not he was armed, and, therefore, the answer elicited to same was not objectionable. However, we do not believe it was legitimate testimony to have permitted the witness to state that he told all of his family good-bye; that he told his brothers to be good men and meet him in heaven, and not to hurt anybody; that he kissed his wife good-bye, and said that he forgave the man who shot him. This the court explains was admitted in connection with the testimony of Dr. Black as laying the predicate for the admission of the dying declarations. The explanation is somewhat confused, but we take it that Dr. Black had already testified before any of this occurred, that deceased told him he was going to die, and asked him to send for his family, who were in an adjoining room, or some other room of the residence. If the predicate

for the introduction of said testimony had been at all doubtful, it may have been permissible to have allowed so much of this as would tend to establish deceased's consciousness of approaching death; that is, that he told his wife and relatives good-bye, but the other portion of his testimony as to his advice to them, to wit: to meet him in heaven; not to hurt anybody, and that he forgave the man who shot him, was certainly not evidence to which deceased or any other witness could have testified to, had they been present at the trial, and was of a character calculated to prove exceedingly hurtful to appellant. Dying declarations at most are exceptions to the rule, which rejects hearsay testimony; when this character of evidence is admitted, it should be very carefully safeguarded, and nothing but an essential part of a dying declaration should be·permitted to go to the jury, especially testimony calculated to inflame the minds of the jury, such as this was. It occurs to us that this was serious error. See Connell v. State, 10 Texas Ct. Rep., 890, and Medina v. State, 63 S. W. Rep., 331. For other authorities see White's Code of Crim. Proc., sec. 1008.

Bill No. 14 questions the admissibility to prove by appellant, on his cross-examination, that one John Majors came to see him while he was in jail, and that he said he was sorry, that he (appellant) was in trouble, and not to say anything, but to keep his mouth closed; to say nothing only to his attorneys. A colloquy ensued in regard to this testimony, which we do not deem it necessary here to copy: the record shows that Majors was not a witness in the case. We do not think this testimony was competent, and on another trial should be excluded.

Appellant strenuously insists that it was not proper for the State to show, as was done in this case, by the witness J. A. Prather, that Ed Prather, his brother, had given him a bribe to swear to fabricated testimony in favor of appellant. Consulting the bill of exceptions and the stenographer's notes, in this connection, it appears that the question came up in this wise: J. A. Prather testified in the case for appellant, and his testimony was, in the main, as to the homicide, as testified to by appellant himself; his testimony was closed on Friday. On the ensuing Monday he was placed on the witness stand by the State, and he testified that the testimony theretofore given in by him on behalf of appellant was fabricated; that he was not present at the time of the homicide, as testified to by him, and that all of his evidence theretofore given in favor of appellant was false; that neither he nor Conant were present in the saloon at the time the fatal shot was fired, as he testified to originally. It seems, in connection with his testimony, that the State desired to further prove by him that he testified from a written memorandum given him by his brother Ed Prather, which he was to swear to, and that Ed Prather promised that he should get $50 for his testimony, $29 of which was paid him; however, the court appears to have excluded this part of his testimony. Subsequently, Ed Prather was placed on the stand, and he was asked

questions in regard to bribing his brother J. A. Prather to testify for appellant, as he had done; he denied that he had procured his brother J. A. Prather to so testify, and further denied furnishing his brother with a written memorandum or a statement of testimony to which he was to swear; he denied that he promised or paid him any money. Thereupon, the witness J. A. Prather was replaced on the stand by the State, and he was permitted then to state the facts as above shown, and to contradict the testimony of Ed Prather. This was objected to by appellant on the ground that appellant was not connected with said transaction; there was no testimony showing that he had any knowledge thereof, and that as to said matters appellant made said Ed Prather his own witness, and they were collateral and not material to any issue in the case and, therefore, the witness Ed Prather could not be impeached. In the absence of some showing that appellant was connected with this transaction, this character of testimony could not be adduced against him as original evidence. See Barbee v. State, 23 Texas Crim. App., 199, and Luttrell v. State, 40 Texas Crim. App., 653. .The State appears to have been impressed with the idea that it could not offer this as original evidence against appellant, but that it could offer same as impeaching testimony. Therefore, it introduced the witness Ed Prather, who was a witness for the defendant, and laid the predicate by him for his impeachment by the evidence of his brother J. A. Prather in regard to the bribery transaction. After laying the predicate, J. A. Prather was again introduced, and contradicted his brother Ed Prather as to said bribery transaction. Of course, it will not be contended that this testimony is original testimony inhering in or appertaining to the case; it transpired long after the case. If appellant was shown to be connected therewith, it would constitute original testimony against him as a circumstance suggesting consciousness of guilt in fabricating testimony, and tampering with witnesses comes under that category, but, as stated, the evidence was not offered as original testimony, but as impeaching evidence. Clearly, it was introduced upon a collateral issue, and was confessedly offered to affect the credibility of the witness Ed Prather. Was it admissible for that purpose? We think the true rule on this subject was stated in Drake v. State, 29 Texas Crim. App., 265. "When a witness is cross-examined on a matter collateral to the issue, his answer cannot be contradicted by the party putting the question, nor is it proper to allow a witness to be cross-examined as to any matter which is collateral and irrelevant to the issue merely for the purpose of contradicting him by other evidence." What is collateral has been well stated by Wharton in his work on Criminal Evidence, 9th ed., sec. 484; quoting from a Pennsylvania case, he uses this language: "The test of whether a fact inquired of on cross-examination is collateral is this: 'Would the cross-examining party be entitled to prove it as part of his case tending to establish his plea?'" And see Hart v. State, 15 Teaxs Crim. App., 202, and Johnson v. State, 22 Texas Crim. App., 206. Applying this

test, was the evidence here offered pertinent to the case, or was it a contradiction upon a collateral issue and not upon any issue involving defendant's guilt or innocence? Evidently it was upon a collateral issue, and both court and counsel so regarded it. The court attempted in its charge to limit this testimony to the impeachment of Ed Prather, but as has heretofore been held by this court, when illegal testimony for impeachment purposes has been admitted, and this of itself is of a hurtful character, it is impossible for the court to limit it so as not to prove injurious to appellant. See Cogdell v. State, 43 Texas Crim. Rep., 178; Morton v. State, 43 Texas Crim. Rep., 533, and Casey v. State, 90 S. W. Rep., 1018.

Appellant insists that the court committed an error in failing to instruct the jury with reference to murder in the first degree, based on the first altercation between appellant and deceased, and cooling-time in connection therewith. We believe he is correct in this contention. The State used this first altercation as furnishing the motive for the homicide, and animus on the part of appellant for committing the homicide. One theory of the State, in this case, is to the effect that appellant went into the saloon of deceased, and because deceased refused to throw dice with him for the drinks, and used toward him insulting language in that connection, appellant left the saloon and procured a pistol, and in about fifteen minutes returned thereto and provoked the difficulty, which brought about the homicide. Now, evidently, this former transaction was used by the State, as it had a right to use it, for the purpose of showing that the intent on appellant's part to kill deceased was formed then; and it is insisted, from his evidence, that his mind was then cool and capable of forming the intent to kill, upon express malice; but we do not understand the rule to be, because appellant, in his own testimony, says that he was not excited by what deceased said to him on that occasion, as by any means conclusive upon this question, as there was other testimony in the case aside from his (appellant's) on this point, and in addition to this, the testimony shows that after he left the saloon, in company with Dunn, that he asked Dunn what he thought deceased meant by what he said, and insisted that the remarks were made for Dunn. Dunn replied that they were not meant for him, that he and deceased were on good terms; that they were meant for him, appellant. We believe if the killing had occurred on the first occasion of appellant's meeting with deceased on that night, their relations therefore being entirely friendly, and a casual difficulty ensuing, in which deceased insulted appellant, that if appellant had then slain deceased the court would have been bound to give a charge on murder in the second degree; and we further maintain if appellant's intent was then formed to kill deceased, and he went off after a pistol, or if his intent to kill deceased was formed after his conversation with Dunn, and he then determined to get a pistol and go back, and his mind was inflamed on account of the previous insult, either at the time it was given, or it became inflamed in his subse-

quent conversation with Dunn, and cooling-time had not elapsed be-
fore he returned and shot deceased, and no other facts intervened in
the case, the court should have given a charge on murder in the second
degree, based on what transpired at the first meeting, and in connec-
tion therewith he should have given the jury an instruction on cooling-
time. It is said, however, that cooling-time is not applicable as be-
tween murder in the first and second degrees. Logically, we can see
no reason why the question of cooling-time is not as much involved
between the degrees of murder as it is between murder and manslaughter.
A killing upon express malice can only be consummated when the in-
tent is formed and carried out in a cool and deliberate mind. If the
insult offered by deceased to appellant on the first transaction was cal-
culated to excite his passion, which is a question for the jury, and the
intent was then formed, and was carried out before cooling-time en-
sued, it would not be murder in the first degree. See Manning v.
State, 85 S. W. Rep., 1149; Puryear v. State, 17 Texas Ct. Rep.,
727; Sowell v. State, 32 Texas Crim. Rep., 498; Keith v. State, 94
S. W. Rep., 1046, and Dixon v. State, rendered at the present term.
We do not believe it was an answer to the above proposition that the
court gave a special charge requested by appellant predicated on the
first meeting between appellant and deceased, as this was on an entirely
different phase of the case. That was a charge on murder in the
second degree, and told the jury, in effect that if on the first meeting
between appellant and deceased, deceased used insulting words to ap-
pellant, and appellant left the saloon and procured a pistol, and
returned to the saloon for the purpose of making an explanation, and
was seeking a peaceful adjustment of the differences, if any, between
them, that appellant had a right to arm himself and seek such explana-
tion, and that if the jury believed from the evidence that after he re-
turned for such purpose, the deceased used insulting language to him, and
defendant then and there became angered on account of the conduct
of deceased, and defendant's mind became excited, and he was not cool
and deliberate, and in such frame of mind he then formed the purpose
of shooting deceased, and he then and there executed such purpose, that
he would be guilty of no higher offense than murder in the second
degree. This charge had no relation to a charge on murder in the
second degree in connection with cooling-time predicated on the first
meeting in the saloon, and nowhere does the court's charge on murder
in the second degree take up and present the phase of the case above
referred to. In regard to this question, we do not believe the point
can be better presented than is done in appellant's brief, from which
we quote, as follows: "It would be manifestly unjust, and unfair for
the State to contend in one breath that the homicide was upon ex-
press malice, for the very reason that the State proved the appellant
was grossly insulted by the deceased, and returned in a few moments
and killed the deceased out of resentment, and that when he did so his
mind was cool and deliberate and, therefore, the crime was upon express

malice, and then instantly turn about and reverse the contention, when the appellant invokes the position upon a defensive question, and hold that appellant was not offended at the insults and did not arm himself and return and slay the deceased out of resentment. If there is evidence in the record to establish the insult and the resentment in order to prove express malice, then the same evidence remains in the case to show resentment upon the question of implied malice."

Appellant strongly insists that the court committed an error in not giving a charge to the jury on manslaughter. We have examined the record carefully, in this respect, and in our opinion the failure of the court to so instruct the jury was error. So far as this record discloses, it shows affirmatively, without controversy, that prior to the night of the homicide deceased and appellant were on friendly terms; both appear to have been engaged in the saloon business in the City of Waco; both it appears were members of a secret society known as the Eagles, and this matter was referred to by appellant during the altercation that lead up to the homicide. Appellant went into the saloon of deceased, and there proposed to throw dice for the drinks; deceased refused to throw dice for the drinks, and in that connection used insulting language toward appellant. In this connection it may be well to quote from one of appellant's witnesses what occurred on that occasion. "Appellant proposed to shake for the drinks, and he invited Luther Phelan to shake. Luther walked around behind the show-case, and Mark said 'Come ,on, let's all shake for the drinks' and the deceased said 'No, I don't want to shake' and Mark reached around and got deceased by the hand, and said, 'Well, come on and have a drink then,' and he asked deceased what was the matter. Deceased said, 'I don't want anything to drink,' and he further said, 'I don't want you or any of your kind around here.' When deceased made use of these remarks he seemed to be a little bit angry; he seemed to be worried about something. Mark reached over the bar and asked deceased what was the matter with him, and got him by the hand and said, 'Why Luther, what is the matter with you?' He spoke in a kind of kidding way, and Luther remarked to him, 'I don't want anything to drink, and furthermore, I will come out there and mix it up with you.' Deceased acted angry when he said he would come out and mix it up with him. Mark told Luther he didn't understand him, and he wanted to know what he was mad about; that he (Mark) had come around there to spend his money," etc. Appellant it seems, after throwing for the drinks, and getting "stuck" as the witnesses term it, set them up; all drank, and he and Dunn retired from the saloon. As they were walking away, appellant suggested to Dunn that deceased had it in for him (Dunn) and asked him if there was anything between them, to which Dunn replied, no, he had nothing against him; that he (appellant) was the man deceasd was after. Thompson and other witnesses show that in about fifteen minutes appellant returned. The State's witnesses show circumstantially that during his absence appellant must have procured a pistol.

Appellant testifies, however, that he had the pistol before they went to deceased's saloon the first time. On coming back into the saloon the second time, appellant states that when he came in Luther Phelan was just closing his register; as he closed the register he took a pistol out of the drawer and stuck it in his right hip pocket, and walked around to the end of the bar, and defendant said, "Come and let's take a drink, to which deceased replied, "God damn you, I don't want anything to drink," and walked on as though he was going out, and got about even with him (appellant). "I said, 'we are both brother Eagles, let's drink and be social'; he says, 'God damn you and the Eagles too, I know when I want a drink, and who to drink with.' I said, 'What's the matter; are you drunk or crazy?' He says, 'No, I am not drunk, you God damn one-eyed son-of-a-bitch; and if you say or even think that I am crazy, I will kill you like a damn dog.' Then he walked on like he was going out. Just as he got to the screen door, he turned around and said, 'If you even think I am drunk or crazy, you God damn son-of-a-bitch, I will kill you,' and then I shot." Now, for the purposes of a charge on manslaughter, we must take as true the testimony of appellant's witnesses, at least for the purpose of measuring out the case to the jury so that they may pass on the facts. Does this evidence raise the issue of manslaughter? The statute says that mere insulting words or gestures are not adequate cause for manslaughter, but here we have something more. If appellant's witnesses are to be believed, he was not only insulted on the first occasion of his going into the saloon, but these insults were intensified, and the vilest epithets were applied to him on coming into the saloon the second time. In addition to this, he states that deceased made a demonstration, and got his pistol out or partly out at the time he shot. This testimony evidently, in the mind of the court, raised the issue of self-defense, and the jury were instructed on the theory of self-defense. The jury did not believe that theory. They might not have believed the theory of manslaughter, but the facts of the case required the court to present that issue to them. Here we have more than mere insulting language; we have demonstration. Appellant may have fired too quick to have been justified on the ground of self-defense, from his own standpoint, predicated on his testimony; his mind may have become excited from the exasperating insults offered to him, and he was not able to see clearly and act with coolness. The question is, was there adequate cause? We think, under the authorities, there was. As has been repeatedly held, the illustrations given in the statute, as to what constitutes adequate cause, are but illustrations of what may constitute adequate cause. The statutory definition of adequate cause is a provocation at the time, which either of itself or in connection with antecedent facts and circumstances is sufficient to render the mind of a person of ordinary temper incapable of cool reflection. It is not necessary to cite authorities, but there are numerous cases in the books where the circumstances are similar or somewhat similar to those involved in this case, it has been

held that it is the duty of the court to charge on manslaughter. See Keith v. State, 94 S. W. Rep., 1044; Harris v. State, 89 S. W. Rep., 1064; Lundy v. State, 87 S. W. Rep., 352; Gray v. State, 83 S. W. Rep., 705; Armsworthy v. State, 88 S. W. Rep., 215; Lewis v. State, 89 S. W. Rep., 1073; Baltrip v. State, 30 Texas Crim. App., 545; Hawthorne v. State, 28 Texas Crim. App., 212; Gilcrease v. State, 33 Texas Crim. Rep., 619; Norris v. State, 61 S. W. Rep., 495; Neyland v. State, 13 Texas Crim. App., 549; Howard v. State, 23 Texas Crim. App., 279; Williams v. State, 7 Texas Crim. App., 396; Hobbs v. State, 16 Texas Crim. App., 517, and McLaughlin v. State, 10 Texas Crim. App., 340.

Coming to some minor questions, we will observe that in another trial of this case, we do not believe the court should charge on the use of more force in the charge of self-defense, as there was no testimony indicating the use of more force. If appellant had a right of self-defense at all, the question of the use of more force was not involved. See Scott v. State, 81 S. W. Rep., 951.

We believe, furthermore, that the court's charge on self-defense is subject to criticism. In concluding the charge on self-defense the court uses the following language, which is that excepted to: "* * * and in this connection you are instructed that unless you believe from the evidence beyond a reasonable doubt that the defendant did not act in his own self-defense as above defined, then you will give him the benefit of the doubt and acquit him." It occurs to us that this is either a charge shifting the reasonable doubt against appellant, or else it is absolutely unintelligible and confusing.

For the errors discussed and herein pointed out, the motion for rehearing is granted, and the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, JUDGE (dissenting).—I do not agree to the reversal of this case. My views upon same are expressed in the original opinion of this court, which were prepared with the utmost care and deliberation, and unanimously assented to. I do not deem it necessary to discuss some of the questions reviewed in the opinion on motion for rehearing, being so incoherently stated that I do not feel called upon to dignify them by discussion. But there are two questions which I deem of vital importance to a proper presentation to the jury of the law of homicide in this State and, therefore, the importance of same impels me into a discussion of them.

The first one is the holding of the court that the issue of cooling-time should have been charged between the degrees of murder. The stereotype charge on murder in the first degree, in defining the mental status of the defendant, reads as follows: "In order to warrant a verdict of murder in the first degree malice must be shown by the evidence to have existed; that is, the jury must be satisfied from the evidence

beyond a reasonable doubt that the killing was a consummation of a previously formed design to take the life of the person killed, and that the design to kill was formed deliberately, with a sedate mind; that is, at the time when the mind of the person killing was sufficiently self-possessed and capable of contemplating the consequences of the act proposed to be done. There is no definite space of time necessary to intervene between the formed design to kill and the actual killing; a single moment of time may be sufficient; all that is required is that the mind be cool and deliberate in forming its purpose and that the design to kill is formed. And in this connection you are charged that the expression 'deliberate and sedate mind' does not mean that the mind must be entirely unruffled or free from passion, but simply that the mind is sufficiently cool and self-possessed as to understand and comprehend the nature and consequences of the act to be done.

"When the evidence satisfies the mind of the jury beyond a reasonable doubt that the killing was the result of a previously formed design by the defendant to kill the deceased, and the design was formed when the mind was calm and sedate, and capable of contemplating the consequences of the act proposed to be done by the defendant, however short a time before the act was done the said design may have been formed, and such killing is further shown to have been unlawful and done with malice, then the homicide is murder in the first degree." Then the charge proceeds and tells the jury if they have a reasonable doubt as to whether the mental status of appellant was cool, calm and sedate and deliberate, they should acquit him of murder in the first degree, and next consider whether he was guilty of murder in the second degree, or if they have a doubt of the degree, they must give the defendant the benefit of the doubt, and find him guilty of the lower degree. Murder in the second degree is a killing upon implied malice, usually engendered upon an inadequate cause, which produces a passion, but it need not be a sudden passion as the statute requires in manslaughter. Now then, if appellant killed the deceased, having cool, calm and deliberate mind, he is guilty of murder in the first degree; if his mind was not cool, calm and deliberate, or the jury have a reasonable doubt of said fact, under all the charges this court has ever approved, he must be found guilty of murder in the second degree. Then the element of cooling-time, as suggested by the court, does not enter into a philosophic consideration of the grades of murder. It makes no difference what length of time has elapsed from the previous provocation; if the defendant's mind is not cool, calm and deliberate, or if the jury have a reasonable doubt thereof, the law demands that they should only inflict upon appellant murder in the second degree. In the case of Franks v. State, 88 S. W. Rep., 923, we laid down the law of cooling-time and approved the following charge: "On the other hand, if the design to unlawfully kill has its inception and origin in an inflamed and excited mind, yet if there be sufficient time for the passion to subside and for reason to interpose, and a homicide be committed in pur-

suance of a design thus previously conceived, the offense is murder upon express malice, and therefore murder of the first degree." Or, in other words, whether the defendant's mind be cool or not, if it has had sufficient time for the mind of a man of ordinary temper to have cooled, the law presumes his mind has cooled. In the last cited case we overruled the law as laid down with reference to cooling-time in the case of Jones v. State, 33 Texas Crim. Rep., 499. Now then, the majority of the court, in this case, insists that this charge on cooling-time should be given between the degrees of murder. If so, it would become an offensive weapon in the hands of the State instead of being an element of self-defense gainst murder in the first degree, since under the law of murder in the first degree appellant could be guilty of said grade of homicide regardless of time; that is, that the killing was not done with a cool, calm and sedate mind, whereas if the court is required, as it is under the majority of opinion on this motion for rehearing, to tell the jury that if sufficient time has elapsed for his mind to cool from the first indignity to the second meeting, then the law presumes that his mind has cooled, and, therefore, it would be murder in the first degree. This certainly would be a charge against appellant and in violation both of the spirit and letter of the law of murder in the second degree. The case of Dixon v. State, cited by majority opinion of this court upholding this doctrine, was decided at this term of the court. I do not agree to the doctrine there laid down. The case of Manning v. State, cited by majority opinion was on motion for rehearing, and the writer of this opinion appears to have agreed to it, but if I did it was through the sheerest inadvertence and I know of no authority in Texas for said proposition except the Manning case and the Dixon case. Then clearly it would be a charge against appellant's interest, as stated, to tell the jury that if sufficient cooling time has elapsed the law presumes appellant's mind has cooled, when appellant's mind, under murder in the second degree, does not have to cool, nor does the element of time enter into the question as to whether it has cooled in order to make murder in the second degree. For discussion of the question of cooling-time, see the above cited case.

The other question I wish to review and dissent from by written opinion, is the majority of this court holding that the issue of manslaughter is in this case. If it is, then said issue is in every case where appellant relies upon self-defense. In the original opinion in this case I carefully collated, as the majority now concede, the evidence in this record. The evidence shows that if appellant was laboring under any apprehension at the time he shot the deceased it was one of personal danger to himself; he so swears, and for the court to eliminate his motive for the killing, and say perhaps the jury might conclude that he was not acting in self-defense but shot through fear, is to base a presumption upon a presumption, which, by none of the rules of law or logic, is ever permissible. How can we presume a witness, who swears that he shot in self-defense, was lying about the latter proposi-

tion, and upon that proposition base the further proposition that he shot through fear or terror. The grades of homicide in our statute are provided for a very beneficent purpose, as a legal guide to the jury in assessing the punishment to be accorded appellant for a homicide. The books are full of authorities holding that a grade not presented by the evidence should not be charged upon. Now this decision eliminates every possible doubt upon the proposition that in every case where appellant's evidence suggests self-defense, then the court must presume that he was telling a falsehood about shooting in self-defense, and upon that presumption base another presumption that he evidently was shooting through fear or terror. Whenever appellant swears that he shot · deceased because he feared an injury to his person from an assault contemplated or committed by the deceased, there is an element of apprehension and probable fear that prompts the blow that kills deceased, but certainly this is not the kind of fear upon which manslaughter is based. If so, as stated, in every case where self-defense is relied upon, the issue of manslaughter is suggested. To this proposition I enter my dissent. I think the questions involved in this record were all properly treated and accurately treated in the original opinion of this court, and it would be too tedious to review the other questions, as stated above, relied upon now for reversal thereof. So believing, I express the above views thereon.